UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSHUA LEE McGIBONEY, | Case No. 1:16-cv-00150-REB |
| Petitioner, | |
| | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| KEITH YORDY, Warden of the Idaho State Correctional Institution, | |
| Respondent. | |

## INTRODUCTION

In this habeas corpus matter, Petitioner Joshua Lee McGiboney ("Petitioner" or "McGiboney") challenges his state court convictions of robbery, aggravated battery, and burglary—all of which stemmed from an incident that occurred on April 3, 2008. The parties are familiar with the underlying facts, and the Court will not repeat them except as necessary to explain this decision.

Now pending before the Court is Respondent's Renewed Motion for Summary Dismissal. The Court previously determined that Petitioner's claims were procedurally defaulted but that it did not have sufficient information to determine whether cause and prejudice, or actual innocence, excused the default. (*See* Dkt. 34.) The Court therefore ordered discovery, pursuant to Rule 6 of the Rules Governing § 2254 Cases ("Habeas Rules"), as to the following types of evidence:

> (1) State's trial exhibits 61 (gun magazine), 61B (unused
> round), 61C (unused round), 61D (unused round); 62 (used
> round), 63 (fired shell casing), 64 (fired shell casing), 65
> (fired shell casing), 66 (unfired 9MM round), and 67 (unfired
> 9MM round), to be sent to Bode Cellmark Forensics for
> testing; (2) "all notes, DNA profiles, allele tables, test results,
> charts, and reports associated with forensic DNA testing" in
> Petitioner's case that are in the possession of the Idaho State
> Police; [and] (3) records from Buckhorn Gun and Pawn
> related to the firearm at issue in Petitioner's case.

(*Id*. at 20.)

Although the Court denied Petitioner's request for discovery as to four other

categories of evidence, Petitioner has utilized public records requests to obtain certain

evidence in those categories:

> (4) crime scene photographs in the possession of the Ada
> County Prosecuting Attorney's Office; (5) crime scene
> photographs in the possession of the Ada County Public
> Defender's Office; (6) two audio CDs of officers' initial
> witness interviews in the possession of the Ada County
> Prosecuting Attorney's Office; and (7) two audio CDs of
> officers' initial interviews in the possession of the Ada
> County Public Defender's Office (to the extent they were
> produced during discovery in Petitioner's underlying criminal
> proceedings).

The parties stipulated to expand the scope of discovery to two additional

categories of evidence. Pursuant to the stipulation, Petitioner subpoenaed (8) "the Boise

Police Department for an unredacted copy of a letter from American Bankers Insurance

Company of Florida" and (9) "America Bankers Insurance company of Florida, or its

successor in interest, for documents related to the loss and the paid claim recited in the

letter." (Dkt. 24 at 1-2.) Petitioner has obtained this evidence, and the Rule 6 discovery

has been completed.

**MEMORANDUM DECISION AND ORDER - 2**

Petitioner acknowledges that discovery with respect to Categories 1 through 3 was not fruitful. (Dkt. 30 at 2 ("Buckhorn Gun and Pawn has informed McGiboney's counsel that, despite searching, it was unable to find ownership or sales records for the gun. And, Bode Cellmark did not find sufficient material on the spent and unspent shell casings, and the gun magazine, to test for a match to the known DNA profiles.") (internal citations omitted).) However, relying on (1) evidence previously presented to the state courts and (2) evidence in Categories 4 through 9 that was recently obtained, Petitioner renews his argument that all of his claims are excused from procedural default based on the actual innocence exception.[1] *See Schlup v. Delo*, 513 U.S. 298, 329 (1995).

The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Dkt. 9.) Having fully reviewed the record, including the state court record, the Court finds that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). As explained below, the Court also finds that an evidentiary hearing on actual innocence is unnecessary.

For the reasons that follow, the Court concludes that, although Petitioner has submitted impeachment evidence with more than de minimis value—primarily with respect to the credibility of the victim—he has not met the strict standards of the actual innocence gateway exception. Accordingly, Petitioner has not established an excuse for

---

[1] Petitioner has withdrawn his argument that certain claims are excused from procedural default pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). (*See generally* Dkt. 30.)

the default of his habeas claims, and the Court will grant Respondent's Renewed Motion and dismiss the Petition with prejudice.

## DISCUSSION

**1. The Actual Innocence, or Miscarriage-of-Justice, Exception to Procedural Default**

A procedurally defaulted claim may be heard on the merits if the petitioner demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice, meaning that "'a constitutional violation has probably resulted in the conviction of someone who is actually innocent.'" *Schlup*, 513 U.S. at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). In asserting actual innocence, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324.

A court considering whether a petitioner has established actual innocence in light of that "new reliable evidence" must consider "all the evidence, old and new, incriminating and exculpatory, admissible at trial or not." *Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011) (en banc) (internal quotation marks omitted). An actual innocence analysis "requires a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard"; in other words, the federal court must "make a probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538-39 (2006) (internal quotation marks

omitted). A court must assess the "likely impact" of the new reliable evidence "on "reasonable jurors in light of the complete record." *Lee*, 653 F.3d at 945.

To apply the actual innocence exception, a court must conclude that, "in light of all of the evidence, 'it is more likely than not that no reasonable juror would have found [the petitioner] guilty beyond a reasonable doubt.'" *United States v. Avery*, 719 F.3d 1080, 1083 (9th Cir. 2013) (quoting *Schlup*, 513 U.S. at 327). That is, the petitioner must show that *every* reasonable juror would vote to acquit.

This is a particularly exacting standard, one that will be satisfied "only in the extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). Indeed, cases where the *Schlup* standard has been satisfied have "typically involved dramatic new evidence of innocence." *Larsen v. Soto*, 742 F.3d 1083, 1096 (9th Cir. 2013). However, because a *Schlup* claim is, by definition, accompanied by "an assertion of constitutional error at trial," the petitioner's conviction "may not be entitled to the same degree of respect as one ... that is the product of an error-free trial." *Schlup*, 513 U.S. at 316.

Direct evidence of innocence is not necessarily required for an actual innocence gateway claim; in rare circumstances, impeachment evidence alone can satisfy the *Schlup* standard. *See Sistrunk v. Armenakis*, 292 F.3d 669, 676 (9th Cir. 2002). But impeachment evidence can meet the *Schlup* standard only if it is so compelling that it "fundamentally call[s] into question the reliability of [the petitioner's] conviction." *Id.* at 677.

For example, a "detailed third-party confession" that "undermine[s] the validity of the prosecution's entire case" would be compelling impeachment evidence. *Id.*; *see also Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997) (actual innocence standard met where witness whose trial testimony led to petitioner's conviction later gave a sworn confession to the crime); *Larsen*, 742 F.3d at 1096 (actual innocence standard met with "witnesses who were never called to speak on his behalf at his trial and who gave credible testimony that someone other than [petitioner] committed the acts for which he was convicted and sentenced"). However, evidence that "would not have cast doubt on the first-hand account of the victim, who positively identified [the petitioner] in open court" would not. *Sistrunk*, 292 F.3d at 677. The actual innocence exception is not satisfied by evidence that is speculative, collateral, cumulative, or "insufficient to overcome otherwise convincing proof of guilt." *Larsen*, 742 F.3d at 1096.

Further, if the evidence relied upon is not truly "new" but, instead, was in substance already before the jury, it is unlikely to weigh heavily in favor of actual innocence. *See Lee*, 653 F.3d at 944-45 (holding that (1) evidence of potential misidentification was insufficient for actual innocence when "[m]uch of th[at] evidence was presented to [petitioner's] trial jury, and (2) "[g]iven all that [petitioner's] jury heard about [the second potential perpetrator] at trial," it was not "more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt.") (internal quotation marks omitted).

Petitioner claims that he is entitled to application of the actual innocence exception without the need to further develop the evidence on which he relies. Alternatively, he asserts that, "if the Court finds that there are unresolved factual issues," an evidentiary hearing is warranted. (Dkt. 30 at 2.)

An evidentiary hearing on actual innocence "is not necessary ... if the court determines as a matter of law that [the petitioner] cannot satisfy the standard. *Clark v. Lewis*, 1 F.3d 814, 820 (9th Cir. 1993) (cause-and-prejudice context). And in considering an actual innocence gateway claim, including whether to hold a hearing on such a claim, the Court has the discretion to assess the reliability and probative force of the petitioner's proffer, including making some credibility determinations, if necessary. A district court's assessment of the credibility and reliability of the new evidence is not corralled by "a standard appropriate for deciding a motion for summary judgment." *Schlup*, 513 U.S. at 332. Rather, a district court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Id*. Hence, unlike in a Rule 56 context, the Court is not prohibited from weighing the evidence, and—in so doing—it "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id*.

As explained below, there is "ample support" in the record for a conclusion that the "newly-discovered evidence d[oes] not tip the *Schlup* determination in [Petitioner's] favor." *Stewart v. Cate*, 757 F.3d 929, 943 (9th Cir. 2014). The Court need not hold an

evidentiary hearing on this issue because, as a matter of law, Petitioner is unable to establish that he is actually innocent. *See Clark*, 1 F.3d at 820.

## 2. The Two Differing Theories of the Case

Petitioner testified that, on April 3, 2008, he was walking alone on Orchard Street, on his way to a bowling alley to meet a friend named Darby Lusk. He stated that a person, whom he learned later was Ryan Lowe, yelled at him, grabbed him, and threatened him with a gun. The gun was Lowe's, not Petitioner's. A struggle ensued, and Petitioner hit Lowe in the head with a landscaping brick that he found on the ground. Petitioner dropped the brick and began to run away. Lowe warned Petitioner to stop or Lowe would shoot him. Petitioner slowed down but kept walking away with his hands in the air. Lowe fired a shot toward Petitioner. There was another struggle, and Lowe fired several more shots, one of which injured Lowe's roommate, David Bergerson, who had by that point joined the fray. Petitioner grabbed the gun and ran away. No other witnesses testified for the defense. (State's Lodging A-2 at 1151-69, 1177-79.)

The state's theory was vastly different and was supported primarily by the testimony of Lowe and Bergerson. (*See id.* at 339-479.) According to that testimony, Petitioner and two other individuals burglarized and robbed a residence shared by Lowe, Bergerson, and Bergerson's girlfriend and infant son. These four residents were in the house at the time of the robbery, but the perpetrators personally interacted only with Lowe and Bergerson. After searching Lowe's room and taking various items of property, the robbers began to leave. Lowe immediately ran after the perpetrators, two of whom got away and left the scene in a car. Lowe caught Petitioner, and they began to struggle.

**MEMORANDUM DECISION AND ORDER - 8**

Petitioner, not Lowe, drew a gun. Petitioner hit Lowe in the head with the gun and the two fought over the gun. Although Lowe's fingerprint was found on the magazine—inside the gun—Lowe testified that he might have touched the magazine if it was ejected during the altercation.[2] Bergerson, after ensuring the safety of his girlfriend and son, retrieved a knife and stabbed Petitioner in the leg in an attempt to help Lowe. Petitioner fired the gun and shot Bergerson in the shoulder.[3] Petitioner fled the scene and dropped the gun. He was apprehended shortly afterwards.

In addition to Lowe and Bergerson, the following trial witnesses—among other evidence—supported the state's theory: (1) Bergerson's girlfriend, April Williamson, who testified that Bergerson woke her up immediately after the robbery and that she watched, through her bedroom window, as two men ran across the street, got into a car, and sped away (*id*. at 583-86); (2) Nicholas Anderson, a neighbor who testified that he saw four to six individuals in a confrontation outside Lowe's residence and that he saw Petitioner draw and fire the gun (*id*. at 617-37); (3) Michael Roberts, who encountered Petitioner later that night and who testified that Petitioner was acting suspiciously, by lingering in a backyard after he was told to leave and by jumping a fence to get away rather than walking down an open path (*id*. at 667-71); and (4) Officer Michael

---

[2] Lowe discovered after the incident that he had a wound on his thumb that, he speculated, might have been caused by the magazine being reinserted into the gun during the struggle. (State's Lodging A-2 at 510-11.)

[3] Petitioner was charged with aggravated battery, as to Bergerson, based on the shooting. The jury acquitted Petitioner of that charge—an element of which was that the shooting was willful or intentional. See Idaho Code §§ 18-903(a), 18-907(1).

Richmond, who apprehended Petitioner and who testified that Petitioner initially looked at Richmond but then started to walk away (*id*. at 694-96).

The jury believed the prosecution's evidence and found Petitioner guilty.

**3.     Petitioner Has Not Established Actual Innocence to Excuse Procedural Default**

Petitioner relies on several pieces of evidence not presented at trial to argue that no reasonable juror could now find him guilty beyond a reasonable doubt. Having carefully considered this evidence, along with the trial evidence, the Court concludes that Petitioner cannot meet the *Schlup* standard.

### A.     *Affidavit of Darby Lusk*

Darby Lusk, the friend Petitioner testified he was meeting the night of the robbery, stated in a 2010 affidavit that she had plans to meet Petitioner at the bowling alley the night of the robbery. Lusk said that she tried to contact Petitioner's trial attorney, but her calls were never returned. (Dkt. 30-2 at 2.) This affidavit supports Petitioner's testimony at trial as to "why he was on Orchard Street that night"—he was going to meet Lusk at the bowling alley. (Dkt. 30 at 18.)

This evidence has only slight relevance, however. That Petitioner had planned to meet Lusk that evening does not mean that he did not *also* rob and assault Lowe and Bergerson. It also fails to contradict April Williamson's testimony that she saw two men run across the street away from the residence, get into a car, and speed away—indicating that Petitioner was not simply walking down the street by himself that night. The Court thus gives the Lusk affidavit little weight.

### B.     *Fingerprint Examiner and Firearms Expert*

Petitioner has submitted the affidavit of Robert Kerchusky, a fingerprint examiner. Kerchusky states that he examined the report regarding Lowe's fingerprint on the magazine of the gun, the photographs of the magazine, and the photographs of the fingerprint. Kerchusky's "professional opinion" is that Lowe left the print "when he was loading the magazine" and that the print "was not placed there during a struggle between two people for the possession" of the gun (Dkt. 30-3 at 2-3.) The affidavit also claims that Lowe's "print is not smeared and of good quality, indicating that the magazine was stable when the print was deposited." (*Id*. at 3.)

Petitioner has also presented the Declaration of Don Cameron, a firearms expert. Cameron states that a semiautomatic firearm, like the one at issue in this case, must be loaded when the magazine is outside of the gun and that, after the magazine is loaded, it must be inserted back into the gun in order for the gun to fire. (Dkt. 30-4 at 3.) Cameron opines as follows:

> The exterior walls of the magazine can only be touched when the magazine is outside of the pistol. It would be impossible for a finger or thumb print to be put on the magazine when any other part of the pistol is touched with the magazine inserted in the pistol. The only way a finger or thumb print could be found on the magazine is if the magazine is handled when it is outside of the pistol.

(*Id*.)

The Court questions whether these expert declarations are "new" evidence. The declarations are merely cumulative of evidence presented at trial—the jury knew Lowe's fingerprint was on the magazine, was able to see the gun, and heard testimony from a

firearms expert about how the gun was loaded and otherwise functioned. The "new" declarations simply restate the obvious question posed and probed at trial—if the magazine was inside the gun, and Lowe's fingerprint was on the magazine, how could the gun not have belonged to Lowe? The jury was well aware that the placement of Lowe's fingerprint perhaps meant that Lowe—not Petitioner—had inserted the magazine into the gun before the altercation and, thus, that the gun could have been Lowe's.

On these points, Lowe testified at trial that he was not sure how his fingerprint got onto the magazine, but he guessed that the magazine might have been ejected out of the gun but reinserted during the struggle for the control of the gun:

> Q. ... I want to ask you about—the jury's going to hear testimony, and I think you know, too, that your fingerprint was found on the magazine of the gun, kind of toward the butt of the magazine of the gun.
>
> Can you tell the jury if you have any idea how your thumbprint ended up there?
>
> A. Like I said, we were struggling. I had my hand all over that gun and easily could have ejected the clip, which is just, I guess—you, some guns just have a button where you push. And—and I—I don't know.
>
> But later that night—or that night, I had a—like I pinched myself on my thumb. So, easily could have came [sic] out, came back in, and pinched myself.
>
> Q. Okay. And do you have any recollection of that happening, as far as that—I mean, do you recall the magazine coming out, or the gun jamming at any point, or anything like that?
>
> A. No.

| Q. | Okay. And as far as the—the—the thumb, did you have any bruising or any injury? |
|----|---|
| A. | It was pinched. So, yeah, there was a little bruising. |
| Q. | Okay. And, at that time, did you know what that was from? |
| A. | I didn't, no. |

(State's Lodging A-2 at 510-11.) The jury evidently believed this explanation, and Petitioner's "new" expert opinions on the topic of Lowe's fingerprint add little to the mix that was not already presented at trial.

On the other hand, Lowe's fingerprint on the magazine was—and is—the strongest piece of evidence supporting Petitioner's story of what happened. Though the new declarations are "far from conclusive," they do have "some impeachment value." *Sistrunk*, 292 F.3d at 676. The Court thus gives the Petitioner's expert declarations some weight.

### C.     *Polygraph Results*

Petitioner has taken a polygraph test. Petitioner answered "No" to the following four questions: (1) "Prior to April 3, 2008 - had you ever touched the gun used in this incident?"; (2) "Did you ever touch the magazine of the gun used in this incident?"; (3) "On April 3, did you take anything from within the residence at 810 S. Orchard?"; and (4) "During this incident - did you hit Ryan [Lowe] first?" (Dkt. 30-5 at 6.)

According to the polygrapher, Petitioner "showed no significant prevailing reactions to the relevant questions," which was "consistent with truthfulness." (*Id*. at 7.) But the polygrapher qualified these results, stating that "[e]thical empirical practices

dictate the application of normative data to exceptional individuals (i.e., persons whose functional characteristics are outside the normal distribution of individuals in the intended sample or population)," and that, therefore, polygraph test results "should always be regarded with caution." (*Id.*)

Though polygraph results are inadmissible in Idaho courts, the fact that Petitioner passed the polygraph constitutes some evidence that Lowe's and Bergerson's trial testimony might have been false and that Petitioner's might have been true. However, because (1) polygraphs are not entirely reliable, (2) some individuals will pass a polygraph despite lying to the polygrapher, and (3) the results of polygraph tests must "always be regarded with caution," the Court does not believe that Petitioner's polygraph test is entitled to significant weight. Additionally, the jury had the opportunity to assess the demeanor of *all* of the witnesses, circumstances that a polygraph examination simply cannot replicate. *See Sistrunk*, 292 F.3d at 676 ("The jury, of course, saw and heard the victim testify and therefore was afforded the first-hand opportunity to judge her credibility."). Finally, Petitioner's recent polygraph does not explain away his failure to seek aid from Michael Roberts or his attempt to avoid Officer Richmond when he was first discovered—behavior which, as the prosecution pointed out in closing argument, is inconsistent with that of an innocent victim whom Lowe had just attacked, threatened at gunpoint, and tried to shoot. (State's Lodging A-2 at 1279-80.)

### D.  *Statements of Justin Loera*

Justin Loera, a friend of Bergerson's, stated in a February 2014 affidavit that Lowe told him he was "hit in the head with a brick" during the struggle and that Lowe

"got his gun taken away by Josh McGiboney." (Dkt. 30-6 at 2.) Loera also executed an April 2014 affidavit, in which he again stated that Lowe told him "he had been hit on the head with a brick" and that Lowe "never said that he was hit on the head with a pistol." (Dkt. 30-7 at 2.) Loera reported that Lowe told him these things a "few days" after the incident. (*Id*.)

That the affidavits contain hearsay does not prohibit the Court from considering this evidence. *Lee*, 653 F.3d at 938. Nonetheless, the Court concludes that, though Loera's affidavits have some limited impeachment value, they do not constitute particularly strong evidence of Petitioner's innocence.

First, Loera did not describe Lowe's alleged statements until nearly six years after the incident. (*See* Dkt. 30-6 & 30-7.) The lateness of the Loera affidavits suggests they are of questionable reliability. *See Schlup*, 513 U.S. at 332 ("[A] court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.").

Second, Lowe testified at trial that there were landscaping bricks at the scene and that he was unsure whether he was hit in the head with a brick or a gun: "I mean, we had bricks laying around. It could have easily been a brick...." (State's Lodging A-2 at 510.) This is unsurprising, given that Lowe and Petitioner were—by all accounts—locked in a potentially deadly struggle, and Loera's statement that Lowe said it was a brick is cumulative of Lowe's own testimony as to what might have happened.

Third, Lowe's alleged statement to Loera about getting his gun taken away by Petitioner could mean something other than that Lowe came into the confrontation armed with his own gun. As Respondent argues, during his conversation with Loera about what happened, Lowe could have meant that he was "disarmed of a gun that he had his hands on at some point during the struggle," rather than "specifically and necessarily asserting that Lowe actually *produced* the gun in the course of the confrontation." (Dkt. 33 at 16.)

Fourth, Lowe's alleged hearsay statement to Loera that Lowe got "his" gun taken away does not "cast doubt on the first-hand account" of Nicholas Anderson, "who positively identified [Petitioner] in open court" as the person who drew and fired the gun. *Sistrunk*, 292 F.3d at 677. Anderson testified as follows:

> Q.     Can you describe what happened?
>
> A.     ... [W]e look out that window and we see everybody that had worked their way from here, right over to here behind our four cars.
>
>        And we hear people yelling and screaming, as—as well as pull back a curtain and see a handgun being drawn out of a waistline.
>
>        And we see, initially, one shot with a—I guess with what I would describe as a burst out of the end of the—of a handgun.
>
> ...
>
>        ... [T]here is our personal cars parked right here. At that point, everybody comes from here, you just see nonstop chaos.
>
>        One guy takes off this way, one guy goes this way, and the individual with a handgun pulls it out right here and fires off one shot. You can see with the—like I

said, the flame or burst or—out of the end of the barrel of the handgun.

...

Q.     .... And would you be able to identify the individual ... who pulled the gun out of his waistband, if you saw that person again?

A.     Yes, I could.

Q.     Is that person seated in the courtroom today?

A.     Yes, he is.

Q.     And if you could, please, point him out and describe an article of clothing that he's wearing?

A.     He is sitting next to the gentleman in the gray suit, and has a white dress shirt on.

Q.     Okay. And are you certain that that's the person who you saw on April 3, 2008, that you've described...?

A.     Yes, I am.

...

Q.     Is that the same individual, that pulled the handgun from his waistband, that you've just described?

A.     Yes, it is.

Q      And is it the same person who fired the weapon?

A.     Correct. Yes.

(State's Lodging A-2 at 618, 625, 636-37.)

Anderson did not know Lowe or Bergerson other than by sight, and he had no reason to lie about what he saw. Petitioner argues that Anderson's identification is unreliable, but the potential weaknesses in that identification were already exposed at

trial. Anderson was a distance away from Petitioner at the time and it was fairly dark, but

Petitioner's trial counsel cross-examined Anderson on these points. (State's Lodging A-2

at 637-56.) Hence, the jury knew of the possible problems with the identification and

presumably considered them when evaluating Anderson's testimony.

In sum, although Loera's 2014 affidavits constitute some evidence that Lowe

owned the gun and pulled it on Petitioner—instead of the other way around as Lowe

testified at trial—this less-than-reliable impeachment evidence is not especially "dramatic

new evidence of innocence." *Larsen*, 742 F.3d at 1096.

### E.    *Photograph of Landscaping Brick*

Petitioner testified that he hit Lowe with a landscaping brick he found at the scene.

In closing argument, the prosecutor assailed that testimony by relying on various

photographs of the scene, none of which showed such a brick:

> You recall the defendant's testimony, a short time ago,
> where he indicated that this is generally the area where he
> believed that he picked that brick up .... And if you look at the
> photographs, go back and look at all the crime scene
> photographs, ladies and gentlemen, you're not going to see a
> brick there.
>
> And we've looked at some of the other ones earlier
> here, today, but there is no brick. And again, the defendant
> said, yeah, I think it was here, somewhere in this area. And he
> was certain that he used a brick, but there is no brick, in the
> crime scene, in these photographs.

(State's Lodging A-2 at 1273-74.)

Now, Petitioner presents a contemporaneous photograph of the scene that does, in

fact, show a landscaping brick. The brick is on the ground, a bit apart from the rest of the

organized landscaping bricks (Dkt. 30-1 at 10.) Petitioner argues that this photograph corroborates his testimony that he hit Lowe with a brick.

Once again, Petitioner's new evidence is only somewhat relevant to impeach Lowe's testimony. As explained above, Lowe himself acknowledged that there were bricks on the property and that he might have been hit with a brick instead of a gun. (State's Lodging A-2 at 510.) Additionally, that a landscaping brick might have been used during the struggle does not mean that Petitioner did not also pull a gun and hit Lowe in the head with the gun (or the brick). The photograph certainly does not impeach Anderson's unequivocal testimony that it was Petitioner who drew and fired the gun, nor does the photograph explain away Petitioner's suspicious behavior with respect to Michael Roberts or Officer Richmond.

### F. Declaration of Travis Williams

Petitioner also relies on the Declaration of Travis Williams, Anderson's roommate. Williams did not testify at trial, but said the following in an initial statement:

> At about 11:15 pm I was in my room getting ready for bed when my roommate [Anderson] came and told me that the neighbors were fighting. I came out with him to the living room window and we peeked out behind the drapes. I saw one kid run down Orchard in the south direction while two other kids were arguing. One of these two kids were [sic] walking away from the other with his hands in the air. The kid pulled a gun out on the kid walking away and fired a shot. As soon as I heard and saw the gun shot I hit the floor and crawled away from the window back to my room and my roommate called 911. While on the phone we heard 3 more shots and screaming.

(Dkt. 30-8 at 5.) In a July 2018 declaration, Williams again states that, on the night of the incident, he heard people fighting and that, when he looked outside, one of them "ran down South Orchard." (*Id*. at 3.) He also reiterates that "[o]ne of the two [other] kids started to walk away with his hands in the air," and the "other kid pulled a gun out on the one walking away and fired a shot." (*Id*. at 4.)

Petitioner is correct that Williams's declaration is consistent with Petitioner's testimony that he was walking away with his hands in the air when Lowe fired a shot towards him. But it does not compel that conclusion.

Indeed, Williams's statements, though corroborating portions of Petitioner's testimony, contradict others. Petitioner states he was walking alone when Lowe suddenly attacked him. Williams's statements indicate that the person walking away from the confrontation had *not* been alone, but had initially tried to run away along with the other person who "ran down South Orchard." Therefore, part of Williams's statement buttresses the testimony of Bergerson and Lowe that there was more than one robber and that Petitioner was the only one of the robbers that Lowe was able to catch. Williams's statements, while somewhat helpful to Petitioner, do not wholly support his *Schlup* claim.

### G.    *Renter's Insurance Policy*

Petitioner has uncovered evidence that Lowe had a renter's insurance policy, that he submitted a claim for the cash and property taken in the robbery, and that his claim was paid. (Dkt. 30-9 & 30-10.) Petitioner points to the insurance policy as a potential motive to fabricate the robbery and to frame Petitioner. But he offers nothing but pure speculation. *See Lee*, 653 F.3d at 944 (expert testimony undermining victim's account

insufficient for *Schlup* claim when the expert's conclusions "hinge[d] on ... speculation from the trial record."). The fact that a person renting an apartment has renter's insurance is unremarkable, and the Court cannot assume from the existence of the policy, or Lowe's claim under that policy, that Lowe (1) planned to commit fraud by staging a robbery, (2) enlisted Bergerson to go along with the fraud with no obvious benefit to Bergerson, and (3) lay in wait for someone—who happened to be Petitioner—to walk past Lowe's residence so they could frame him as their patsy. It could be that Lowe came up with the idea of faking a robbery *after* the altercation with Petitioner—which would be less bizarre than framing Petitioner from the start—but, again, this is simply speculation. The insurance policy has only marginal value as impeachment evidence.

### H.     *Audio Recordings and Transcripts of Police Interactions*

Petitioner presents various audio recordings and transcripts of the initial discussions undertaken by the responding police officers the night of the robbery. The recordings and transcripts merely document the officers doing their jobs—by gathering statements from witnesses and discussing what *might* have happened earlier in the evening when, everyone agrees, there was a chaotic, life-or-death struggle involving at least three people. Nothing in the recordings calls into question any of the state's evidence at trial.

### I.     *Evidence Regarding Brooke Holloway*

Prior to trial, the prosecutor informed defense counsel that Lowe had told her of a possible connection between Lowe and Petitioner—a woman named "Brooke." (Dkt. 30-

1 at 27-28.) Brooke was an ex-girlfriend both of Lowe and of Petitioner; she began dating

Lowe after her relationship with Petitioner ended. The prosecutor's letter stated:

> Brooke (who now lives out of state somewhere) called
> [Lowe] at one point after all this happened and said she would
> give him the names of the other people involved if [Lowe]
> dropped charges against McGiboney. She gave him two first
> names. He thinks she was involved to a certain extent and she
> had acknowledged that in text to another friend....
>
> [Lowe] can only speculate as to motive. It is possible the
> motive was your client was upset because [Lowe] dated his
> ex-girlfriend or Brooke knew about marijuana or money.

(*Id.*) It does not appear that Petitioner's trial counsel investigated Brooke further.

The full name of this person is Brooke Holloway. Petitioner's attorney in this

matter contacted Holloway and reported the following:

> I have been unable to get a signed declaration from Ms.
> Holloway, but I can proffer to the Court that, if subpoenaed to
> testify under oath, I believe she would testify to the
> following. Lowe was interested in dating her, and he may
> have seen McGiboney, who she was then dating, at some
> point. Lowe and McGiboney would pick her up at different
> times, and they may have crossed paths. She was not really
> interested in Lowe, but he hung around her. He was
> possessive and jealous. She does not recall making any phone
> call to Lowe, as reported in the prosecutor's letter. To her
> recollection, no one contacted her to discuss testifying.

(Dkt. 30-1 at 4, ¶ 10.) Petitioner claims that the Brooke Holloway evidence "would have

provided context for McGiboney's testimony for why he was harassed by Lowe while he

was walking down Orchard Street" before the incident. (Dkt. 30 at 18.)

This evidence is a double-edged sword, however. From the prosecutor's letter and

habeas counsel's investigation, one could reasonably infer—as invited by Petitioner—

that contrary to Lowe's testimony, Lowe knew Petitioner and hassled and attacked him on Orchard Street because Lowe was jealous of Petitioner's relationship with Brooke Holloway. On the other hand, one could also reasonably infer that Petitioner's motive in robbing Lowe stemmed from the same type of jealousy. It is also possible that, though Lowe may have known *about* Petitioner (in the way one might know about a girlfriend's previous boyfriend), he did not in fact *know* Petitioner. In other words, it could be that at the time of the robbery and at trial Lowe simply had not connected a face to a name he might not even have known. Finally, Holloway's purported phone call to Lowe about the "other people involved" contradicts Petitioner's claim that he did not participate in any robbery and that he was innocently walking alone on Orchard Street when Lowe attacked him.

As with Petitioner's other evidence, the Holloway information is not particularly convincing evidence of innocence.

### J.     *Lowe's 2013 Criminal Conviction*

Petitioner's reliance on Lowe's guilty plea to drug charges in 2013 (*see* Dkt. 30-1 at 33-67)—nearly five years *after* the April 2008 incident—is misplaced. Lowe's (and Bergerson's) drug use was explored at trial, and the jurors presumably considered it when they decided whose testimony to believe.

### K.     *A Holistic Review of All the Evidence Does Not Establish Actual Innocence*

The Court has discussed the relative weight of each piece of evidence presented by Petitioner. In addition, as required by *Schlup* and *House*, the Court has considered that

evidence collectively—whether admissible or not—along with all of the evidence presented at trial. Petitioner has certainly shown more doubt as to his guilt than the trial evidence established. But the question is whether *every* reasonable juror would be *compelled* to find reasonable doubt. The Court concludes, after careful deliberation, that the answer must be no.

The strongest piece of evidence in Petitioner's favor is Lowe's fingerprint on the gun magazine. It is not especially likely, though not impossible, that Lowe's fingerprint ended up on the magazine in the way Lowe speculated—that the magazine was ejected and that Lowe left the print on the magazine during the struggle for the gun. It is more likely that the fingerprint was left when Lowe loaded the gun. However, the question is *not* what this Court finds to be more likely. The question is not even whether this Court finds reasonable doubt. *Schlup*, 513 U.S. at 329 ("It is not the district court's independent judgment as to whether reasonable doubt exists that the [actual innocence] standard addresses."). Instead, the Court must make a probabilistic determination about what reasonable jurors would do. *Id.*

Here, the fingerprint evidence is not new. The jurors were well aware of the fingerprint on the magazine, and Petitioner's trial counsel relied on that print to argue reasonable doubt. The jurors knew that the magazine, once loaded, was inside the gun and that the magazine would have had to have been outside the gun at some point in order for Lowe's print to have been left there. Despite this knowledge, the jury believed the testimony of Lowe, Bergerson, and Anderson that Petitioner drew and fired the

weapon—*not* Lowe. *See Lee*, 653 F.3d at 944-45 (holding that petitioner did not meet the actual innocence standard where much of the evidence relied upon was already before the jury).

Given that the jury already knew about the fingerprint evidence, the Court must consider whether the other evidence in Petitioner's favor would be enough for every reasonable juror to tip the balance to a finding of reasonable doubt. Justin Loera's statement that Lowe told him Lowe "got his gun taken away," if reliable and credible, would provide some weight to Petitioner's end of that scale. But, as previously described by the Court, Loera's 2014 affidavits (based on a memory from nearly six years earlier) are not entirely reliable, and Lowe could have meant something different, when speaking to Loera, than that Lowe himself actually produced the gun.

Finally, the remainder of the new evidence "only thinly supports [Petitioner's] innocence claim." *Lee*, 653 F.3d at 945. The polygraph results are not entirely reliable. The Brooke Holloway and Travis Williams pieces of evidence weigh in favor of some parts of Petitioner's version of the story but weigh against others. The Lusk affidavit, the brick photograph, the renter's insurance policy, the initial police interactions, and Lowe's 2013 criminal conviction are not strongly relevant.

The Court's conclusion is reinforced by the serious weaknesses of Petitioner's defense. *See Sistrunk*, 292 F.3d at 676 (weak alibi defense). Petitioner's claim of innocence rings false in light of his suspicious behavior when he encountered Michael Roberts and Officer Richmond. If, just out of the blue, Lowe and Bergerson had attacked

Petitioner, why on earth wouldn't Petitioner have sought help when he came across these witnesses? Petitioner offers no convincing explanation. Nor has Petitioner called into question Anderson's identification of Petitioner as the shooter. Anderson was a disinterested observer with no reason to lie, and the potential weaknesses in Anderson's identification were already explored at trial.

A reasonable juror, considering all that is now available, would be confronted with differing evidence as to what precisely happened on April 3, 2008. Was Petitioner innocently walking to a bowling alley when a gun-wielding Lowe and a knife-wielding Bergerson suddenly attacked him? Were Lowe and Bergerson both lying about what happened in a scheme to defraud an insurance company? Or did Petitioner (along with others) instead commit a robbery against Lowe and Bergerson, resulting in the confrontation outside the house? Was Petitioner or Lowe the aggressor during the struggle, and who drew and fired the gun? The evidence on all these points remains—at best—debatable. When such an equivocal record is measured against what the law requires for a *Schlup* gateway claim, Petitioner cannot prevail.

## CONCLUSION

The Court finds that an evidentiary hearing as to the actual innocence gateway exception is unnecessary. A reasonable juror, considering all of the evidence now available, would not be compelled to vote to acquit. Rather than "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," *Schlup*, 513 U.S. at 324, Petitioner has presented some impeachment evidence that does not

"specifically exculpate" him, *Stewart*, 757 F.3d at 940. Because he has not satisfied his extremely heavy burden of establishing actual innocence, Petitioner's habeas claims are not excused from procedural default. Therefore, the Court must dismiss the Petition.

## ORDER

**IT IS ORDERED:**

1.  Respondent's Motion to File Oversize Reply Brief (Dkt. 32) is GRANTED.

2.  Petitioner's Motion for Oral Argument (Dkt. 34) is DENIED.

3.  Respondent's Renewed Motion for Summary Dismissal (Dkt. 28) is GRANTED, and this case is DISMISSED with prejudice.

4.  The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Habeas Rule 11. If Petitioner intends to appeal, he must file a timely notice of appeal with the Clerk of Court. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED: March 26, 2019

Ronald E. Bush
Chief U.S. Magistrate Judge