Page 633

```
 1  gunshots you heard after that first one that you've just
 2  described?
 3       A.   There was three or four more.  And I -- I
 4  believe they were all while I was on the phone with 911.
 5       Q.   Okay.  And at that point, you weren't
 6  actually looking out and seeing anything; is that
 7  correct?
 8       A.   No, I wasn't.
 9       Q.   That's just what you heard?
10       A.   Correct.
11       Q.   Okay.  As far as the -- the shots, how long
12  between the first gunshot going off and the other
13  gunshots that you said you heard?
14       A.   Between the first one, or the initial one,
15  and the rest, there was probably, I don't know, time
16  frame-wise.
17            I mean, there was enough time to the point
18  where we came from this window, crawled behind the couch
19  on our hands and knees into this room.  And then, there
20  was three or four consecutive shots when we were in the
21  room.
22       Q.   Okay.
23       A.   That we could hear.
24            THE COURT:  Would this be an appropriate
25  break point?  We're about an hour and 35 minutes.
```

Page 634

```
 1            MS. BENNETTS:  Yes, Your Honor.  That's fine.
 2  Thank you.
 3            THE COURT:  Ladies and gentlemen, we'll take
 4  a 15-minute recess.
 5
 6            (The jury exits the courtroom.)
 7
 8            THE COURT:  You can step down, sir, if you
 9  would like.
10            Any issues outside?
11            MR. ODESSEY:  No, Your Honor.  Thank you.
12            MS. BENNETTS:  No, sir.
13            THE COURT:  We'll start up at quarter 'til,
14  please.  Thank you.
15            MR. ODESSEY:  Thank you.
16
17            (Brief recess taken.)
18
19            THE COURT:  Ready for the jury?
20            MS. BENNETTS:  Yes, Your Honor.
21            MR. ODESSEY:  Yes, Your Honor.
22            THE COURT:  Bring them in, please.
23
24            (The jury enters the courtroom.)
25
```

Page 635

```
 1            THE COURT:  Please be seated.
 2            You may proceed, Ms. Bennetts.
 3            MS. BENNETTS:  Thank you, Your Honor.
 4       Q.   BY MS. BENNETTS:  So, Nick, after -- you
 5  indicated you were on the phone with dispatch after
 6  you -- you and your roommate kind of dove and hit the
 7  floor; is that correct?
 8       A.   Correct.
 9       Q.   Okay.  And you heard some more shots while
10  you were actually on the phone --
11       A.   Correct.
12       Q.   -- with dispatch; is that -- okay.
13            And how many shots did you hear, after the
14  first one, while you were on the phone with 911?
15       A.   Three to four.
16       Q.   Okay.  And after you heard those shots, did
17  you continue to remain on the ground --
18       A.   Yes.
19       Q.   -- on the floor?
20       A.   I did.
21       Q.   Okay.  And the same with your roommate?
22       A.   Correct.
23       Q.   Approximately how long after that did police
24  arrive?
25       A.   Probably two to four minutes after -- of --
```

Page 636

```
 1  of the initial shot and when I called.
 2       Q.   Okay.  And then, after that, did you see
 3  anything -- after you heard three shots or four shots
 4  while you were on the phone with 911, did you see
 5  anything else happening out in the driveway from that
 6  moment until police arrived?
 7       A.   No.
 8       Q.   Okay.  And then, did you talk with police
 9  about what you had seen?
10       A.   Yes, I did.
11       Q.   Okay.  And would you be able to identify the
12  individual who you saw in the gray sweatshirt, who pulled
13  the gun out of his waistband, if you saw that person
14  again?
15       A.   Yes, I could.
16       Q.   Is that person seated in the courtroom today?
17       A.   Yes, he is.
18       Q.   And if you could, please, point him out and
19  describe an article of clothing that he's wearing?
20       A.   He is sitting next to the gentleman in the
21  gray suit, and has a white dress shirt on.
22       Q.   Okay.  And are you certain that that's the
23  person who you saw on April 3, 2008, that you've
24  described wearing a gray sweatshirt?
25       A.   Yes, I am.
```

### Page 637

```
 1   Q.   And is that the same individual that pulled
 2  the handgun that you've described?
 3   A.   What's that?
 4   Q.   Is that the same individual, that pulled out
 5  the handgun from his waistband, that you've just
 6  described?
 7   A.   Yes, it is.
 8   Q.   And is it the same person who fired the
 9  weapon?
10   A.   Correct.  Yes.
11   Q.   Okay.
12       MS. BENNETTS:  Thank you, sir.  I have no
13  further questions.
14       THE COURT:  Cross-examination?
15       MR. ODESSEY:  Thank you, Judge.
16
17              CROSS-EXAMINATION
18  BY MR. ODESSEY:
19   Q.   Mr. Anderson, can I can ask you few questions
20  today?
21   A.   Yes, you can.
22   Q.   Thank you, sir.  The -- the residence --
23       MR. ODESSEY:  Can we get our screen back?
24  Thank you, Madame Clerk.
25       Dare I trust the laser pointer?
```

### Page 638

```
 1   Q.   BY MR. ODESSEY:  Now, the -- the lighting
 2  that you described, there was some exterior lighting on
 3  your residence at 804 South Orchard, and the garage
 4  that's part of the property at 810 South Orchard, as well
 5  as the property itself at 810 South Orchard; isn't that
 6  correct?
 7   A.   Yes.
 8   Q.   Okay.  Now, you don't know what wattage these
 9  bulbs were, do you?
10   A.   No, I don't.
11   Q.   So, they could have 10, 20-watt bulbs, for
12  all you know?
13   A.   Correct.
14   Q.   And you're for sure that they were all on
15  that night?
16   A.   Yes, they were.
17   Q.   Any doubt about that in your mind?
18   A.   No.
19   Q.   Was there any other light source beside those
20  three locations that you described earlier?
21   A.   No, there wasn't.
22   Q.   The scuffle that you described, was that
23  already underway when you first noticed it?
24   A.   Yes, it was.
25   Q.   And were you just kind of peeking out the
```

### Page 639

```
 1  window to peek out the window, or did the scuffle draw
 2  your attention or?
 3   A.   The scuffle drew my attention.
 4   Q.   And what, specifically, did you hear in that
 5  scuffle that drew your attention, sir?
 6   A.   I could hear swear words, as well as what I
 7  earlier described as just to be chaos.
 8   Q.   Okay.  And the -- the swear words, how many
 9  different voices were putting out swear words?
10   A.   I couldn't tell you.
11   Q.   Numerous?
12   A.   Yes.
13   Q.   And when you say four to six people, you're
14  not sure whether it was four or six; is that fair to say?
15   A.   Correct.
16   Q.   Could have been four?
17   A.   (No audible response.)
18   Q.   Is that a yes?
19   A.   Yes.
20   Q.   Is it possible there were three?
21   A.   No.
22   Q.   Is it possible there were seven?
23   A.   I don't believe so.
24   Q.   Now, these people there that night, I take it
25  none of them -- or take that back.
```

### Page 640

```
 1       Did you know your neighbors at
 2  810 South Orchard?
 3   A.   I did not.
 4   Q.   Did you see them passing where your parking
 5  position was, right next to their house?
 6   A.   Yes.  I had seen them before.
 7   Q.   To pass the time of day?
 8   A.   Correct.
 9   Q.   All right.  And -- and at the -- in August --
10  excuse me -- April, in April of 2008, how long had you
11  lived at your address there, 804 South Orchard?
12   A.   Approximately four months, since January.
13   Q.   Okay.  And did the people at
14  810 South Orchard live at their residence before you came
15  on -- on the scene?
16   A.   Yes, they did.
17   Q.   Okay.  You didn't know them from before?
18   A.   No.
19   Q.   It was a passing acquaintance during the four
20  months that you were there -- there together, up through
21  April?
22   A.   Correct.
23   Q.   And how many people did you understand to --
24  to live at the 810 South Orchard address.
25   A.   I believe -- I think probably two to four.
```